## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **EPHRAIM PANG,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: DLB-19-2283** |
| **ADULT DAY HEALTH, INC.,** | * | |
| **Defendant.** | * | |

## MEMORANDUM OPINION

Ephraim Pang filed suit against his former employer, Adult Day Health, Inc. ("ADH"). ADH operates a senior community center in Gaithersburg, Maryland that caters to ethnic Chinese seniors. Pang alleges he worked many overtime hours each week at this facility without compensation, that ADH terminated his employment after he requested leave to care for his injured wife, and that ADH communicated the news of his termination to a group of seniors in a defamatory manner. He asserts violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401 *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*; a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq.*; and a state law defamation claim.

ADH moves for summary judgment. ECF 61. Several days before ADH filed its summary judgment motion, Pang—who was previously represented by counsel but now proceeds *pro se*—moved for an indefinite stay on account of his serious medical conditions. ECF 60. ADH opposed the stay, ECF 63, and Pang filed a letter replying to ADH's opposition and briefly opposing the summary judgment motion, ECF 66. ADH regarded the letter as an opposition and filed a reply. ECF 69. The Court denied Pang's motion for an indefinite stay and provided him an opportunity

to file additional briefing opposing ADH's summary judgment motion.  ECF 70.  Pang filed another letter opposing summary judgment.  ECF 73.  The Court interprets his letter to also request reconsideration of the Court's decision denying a stay.  ADH then filed a reply to Pang's latest opposition letter, as permitted by the Court's order.  ECF 76.

No hearing is necessary.  Loc. R. 105.6.  For the following reasons, Pang's motion for reconsideration is denied, and ADH's motion for summary judgment is granted.

## I.     Background

ADH operates senior community centers in Maryland that provide "adult day care" services.[1]  ADH's facilities cater to ethnic communities—Korean, Chinese, Russian, and Indian—and many employ bilingual staff.  Among its facilities, ADH operates Rainbow Adult Day Health Centers ("Rainbow"), which serves ethnic Chinese clients.

On February 27, 2017, Pang accepted an offer for employment at Rainbow as a marketing representative, earning $120,000 per year.  ECF 61-2, at 4–5 (60:3 – 61:2).  His direct supervisor was Jeff Wright.  *Id.* at 50.  Pang is fluent in Mandarin, and his work as a marketing representative involved identifying and recruiting potential clients.  *Id.* at 5–7 (61:3 – 63:2).  Specifically, he called or visited locations like hospitals and senior apartments, introduced himself and Rainbow to seniors, and explained how certain programs could help meet their and their families' needs.  *Id.* His formal job description listed the following responsibilities:

- Develop[s] business development strategies for individual facility markets
- Participates in business development and strategy planning sessions
- Works with facility operations to create and implement specialized marketing plans to support core growth opportunities
- Assists in maintaining company branding/image standards
- Facilitates re-branding activities for acquisitions

---

[1] On a motion for summary judgment, the Court considers the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

- Performs other duties from time to time as assigned directly by business development leadership

*Id.* at 55. He would make independent decisions about his work based on the needs of clients and their families. *Id.* at 11 (70:13–17). He did not have any supervisory responsibilities. *Id.* at 10 (66:16–19). In this role, Pang worked approximately 40 hours each week.[2] He would "try to go the extra mile every time" to please the seniors and ensure Rainbow's success in a competitive market. *Id.* at 10 (66:3–15).

In July 2017, Pang accepted a program director position at Rainbow for the same salary. *Id.* at 12 (71:13–19); *id.* at 59 (indicating annual salary of $120,000). Pang previously had expressed dissatisfaction with his salary and a desire to take on more responsibility. *Id.* at 12 (71:1–12). As program director, Pang spent time supervising staff, overseeing purchases, submitting payroll information, attending conferences, and looking at "all aspects of the operation of the center to try to figure out" clients' needs and potential improvements in areas like food and transportation. *Id.* at 21, 29–30 (83:1–21, 91:2 – 92:15). A job posting for the program director position identifies the position's duties to include managing day to day operations; ensuring quality of services and compliance with regulatory requirements; and managing, hiring, training, and scheduling staff. *Id.* at 63. Specifically, the listed job responsibilities are:

- Develop short and long-term goals for Adult Day Health Program.
- Directing and supervising all aspects of the program.
- Personnel Management.
- Ensure compliance with the standards established by the Department of Health and Human Services and other regulatory and accrediting agencies.

---

[2] The record is silent on this point. However, Pang's amended complaint states, "[p]rior to be[ing] assigned the additional tasks in or about October 1, 2017, Plaintiff worked approximate[ly] 40-hour workweeks as marketing representative." ECF 18, ¶ 37. Additionally, in his second opposition to summary judgment, Pang represented he "did not work more than 40 hours during part of [his] employment . . . ." ECF 73, at 1; *see also* ECF 29, at 1 n.1 (Pang's damages disclosure stating "[t]here is no claim being asserted for overtime or other damages under any of the Counts of the First Amended Complaint accruing prior to October 1, 2017").

- Overseeing program safety and emergency evacuation plans.
- Seek and use clinical and administrative guidance as needed.
- Fiscal Administration of the program.
- Establish collaborative relationships to ensure necessary support services are available to members and their families.
- Development and implementation of the program's marketing plan.
- Other tasks as assigned by the leadership team.

*Id.* at 64.[3]  As program director, Pang worked at least 40 hours each week, and he "typically" worked more than 60.  *Id.* at 14 (76:12–17).

Regarding his supervisory duties, Pang testified he delegated tasks and provided training to staff.  *Id.* at 33–35 (95:5 – 97:2).  He also evaluated staff by pointing out when something was not being done properly or could be done in a better way.  *Id.* at 35–38 (97:11 – 100:12).  He described his supervision as more oversight because staff generally had more immediate supervisors.  *Id.*  He did not have "the full authority to impose any disciplinary action" and could only make recommendations to management.  *Id.* at 40 (102:2–21).  His recommendations were implemented or approved "between 10 to 20 percent" of the time.  *Id.* at 41 (103:3–12).  Likewise, Pang interviewed job applicants, but he only made recommendations to upper management for approval and did not hire anyone himself.  *Id.* at 41 (103:13–21).  He believes he was a good manager, *id.* at 23–24 (85:19 – 86:7), but he was frustrated that not all his suggestions were implemented by those higher up in the company, *id.* at 24–27 (86:22 – 89:16).

In October 2017, Pang resigned from the program director position, dissatisfied with his new duties.  *Id.* at 13 (73:1–7).  When he resigned, he thought he would be able to return to the marketing representative position.  *Id.* at 57–58. Upon learning that was not a possibility, he agreed with ADH that he would continue in the program director position for the same salary but with

---

[3] This job description was posted after Pang left the program director position, so it reflects the additional marketing duties he assumed in October 2017.  *See* ECF 61-2, at 63 (stating "Replacement for whom (Name): Ephraim Pang").

additional marketing and census development responsibilities.  *Id.* at 13 (73:3–7); *id.* at 59.  To meet all his responsibilities, Pang began to work 10 to 12 hours a day, 6 days each week.  *Id.* at 15–16, 20 (77:20 – 78:8, 82:2–9).  He continued to report to Wright.  *Id.* at 59.

In June 2018, Pang began reporting to regional director Chris Morris.  ECF 61-3, ¶ 2. Morris testified he found Rainbow's performance to be poor, reflecting decreased financial performance, no admissions, and a declining level of business.  *Id.* ¶ 3.  Additionally, Morris found that Pang interacted with staff unprofessionally.  *Id.* ¶ 4.  Disciplinary Action Forms indicated Pang received written warnings for separate incidents in July and early August 2018, concerning his failure to notify managers that auditors from an outside agency visited the facility and his failure to notify supervisors when an employee had called out for the day and "jeopardize[d] the operational integrity of the center."  ECF 61-4, at 4–7.  Morris testified that he and Wright decided on August 3 to terminate Pang's employment "because of his lack of admissions and not meeting financial goals and expectations, inability to effectively manage the program and staff, inappropriate delegation of authority, refusal to accept responsibility for actions or inactions, and because his salary was not commensurate with his performance."  ECF 61-3, ¶ 5.  No one communicated this decision to Pang on August 3.

On August 4, Pang emailed Morris to inform him he would be taking leave to care for his injured wife.  *Id.* ¶ 6; ECF 61-2, at 44–45 (126:1 – 127:19), 68.  He attached an Employee Time Off Request Form requesting sick leave from August 7 to August 17.  ECF 61-2, at 69.  The form was not an FMLA request, and Pang testified he does not remember filling out any other form for his time off.  *Id.* at 45–46 (127:12 – 128:13); *see also* ECF 61-3, ¶ 8 (Morris testimony that Pang did not request FMLA leave from him).  He could not recall if he contacted anyone at human resources after emailing Morris.  ECF 61-2, at 45–47 (127:12 – 129:22).  After receiving Pang's

email, Morris texted Pang, "Ephraim . . . I received your email regarding PTO . . . I will be there Monday to discuss plans." *Id.* at 70.

On August 6, Morris communicated to Pang that ADH had decided to terminate his employment. *Id.* at 71–75; ECF 61-4, at 11. The next day, Morris announced the decision to a group of seniors at Rainbow, stating the company was moving in a different direction. ECF 61-3, ¶ 9; ECF 61-4, at 10–11. Morris spoke in English, and another employee, Gang (Nancy) Xiao, translated the announcement into Mandarin. ECF 61-4, at 10–11. Xiao stated, in Mandarin, that Pang "is no longer an employee due to some issues at work; had been fired." ECF 61-2, at 48 (147:3–13). Pang testified the Mandarin word used to describe his termination, which he translates as "fired," has negative connotations and implied he was terminated because he did "some wrongdoings." *Id.* Morris testified he stated only that "the Company decided to go in a different direction and that [Pang] was no longer employed by the Company," and that he "never instructed the translator to use the word in Mandarin for 'fired,' rather than 'terminated.'" ECF 61-3, ¶ 9. When questioned by the group of seniors about the reason for Pang's termination, Morris reiterated that the company was moving in a different direction. ECF 61-4, at 11.

Pang filed suit on August 7, 2019. ECF 1. He amended his complaint on January 9, 2020. ECF 18. Discovery closed on June 30, 2021, but the Court extended the discovery period for the limited purpose of allowing Pang to take a Rule 30(b)(6) deposition and to depose Morris and another ADH employee. ECF 49. Pang never scheduled the depositions, and on September 7, Pang's counsel withdrew. ECF 55. Proceeding *pro se*, Pang requested an indefinite stay on October 7, 2021 due to his health problems. ECF 60. Six days later, ADH moved for summary judgment. ECF 61. The Court denied Pang's request for a stay and provided an opportunity for the parties to submit additional summary judgment briefing. ECF 70.

## II.    Pang's Motion for Reconsideration

Pang moves for reconsideration of the Court's decision denying his request for an indefinite stay.  Federal Rule of Civil Procedure 54(b) provides that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  Under Rule 54(b)—as compared to Rules 59(e) and 60(b), which govern challenges to final judgments—the Court has "broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light."  *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).

The Court's discretion under Rule 54(b), however, "is not limitless" and "is 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'"  *Id.* at 256–57 (quoting *Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks omitted)).  Accordingly, the Court may revise a prior order "under the same circumstances in which it may depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice."  *Id.* at 257 (quoting *Carlson*, 856 F.3d at 325).

Pang does not offer any new information or change in case law that would warrant reconsideration of the denial of his request for a stay.  Nor does he identify a clear error causing a manifest injustice.  The Court remains sympathetic to his health problems, but a stay remains inappropriate for the reasons identified in the Court's April 22 Letter Order.  *See* ECF 70.  Pang's

health problems did not prevent him from seeking replacement counsel or preparing and submitting a written response to ADH's motion for summary judgment.

Pang's motion for reconsideration is denied.

## III. ADH's Motion for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In adjudicating a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court must also abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial.'" *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference

upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

### B.  FLSA and MWHL Claims

Pang claims he was not paid at the required rate for his overtime work in violation of the FLSA and the MWHL.  The FLSA "requires that employees be paid time and a half for work over forty hours a week." *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993) (citing 29 U.S.C. § 207(a)(1)).  The MWHL is Maryland's state equivalent to the FLSA, *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001), and requires the same, Md. Code Ann., Lab. & Empl. § 3-415(a).  ADH argues Pang was not entitled to overtime compensation at any point during his employment, either because he did not work overtime or because the nature of his work rendered him exempt from the statutes' requirements.

#### 1.  Marketing representative role

ADH argues Pang did not work more than 40 hours per week when he was a marketing representative, and if he did, he worked in an administrative capacity and was exempt from state and federal overtime pay requirements.  Pang appears to concede the first contention in his opposition, stating "yes[,] I did not work more than 40 hours during part of my employment . . . ." ECF 73, at 1.  This is consistent with Pang's amended complaint, which states "[p]rior to be[ing] assigned the additional tasks in or about October 1, 2017, Plaintiff worked approximate[ly] 40-hour workweeks as marketing representative."  ECF 18, ¶ 37.  It is also consistent with Pang's computation of damages filed pursuant to Rule 26(a)(1)(A)(iii), which states "[t]here is no claim

being asserted for overtime or other damages under any of the Counts of the First Amended Complaint accruing prior to October 1, 2017." ECF 29, at 1 n.1.

To the extent there is a claim here to address, Pang has not provided any evidence bearing on the hours he worked while employed as a marketing representative. Consequently, Pang has not met his burden of showing there is a genuine dispute over whether he worked more than 40 hours per week during the period ADH employed him as a marketing representative. Accordingly, Pang is not entitled to any overtime compensation for that period.

### 2. Program director role

ADH argues Pang was exempt from the overtime payment requirements of the FLSA and the MWHL when he worked as a program director because he was employed in an executive capacity. "The FLSA, and, by extension, the MWHL, exempt certain employees from the requirements of overtime wages, including employees in a bona fide executive, administrative, or professional capacity." *Drubetskoy v. Wells Fargo Bank, N.A.*, No. CCB-13-2196, 2013 WL 6839508, at *7 (D. Md. Dec. 20, 2013); *see also* 29 U.S.C. § 213(a)(1); Md. Code Ann., Lab. & Empl. § 3-403(1). During the period of Pang's employment with ADH, the regulations provided the term "employee employed in a bona fide executive capacity" meant any employee:

> (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $455 per week . . . , exclusive of board, lodging, or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2004).[4]  Maryland regulations define "executive capacity" in the same way as the applicable federal regulations.  Md. Code Regs. 09.12.41.05 (providing "executive capacity" has the meaning stated in 29 C.F.R. § 541.100 *et seq.*); *see also Williams v. GENEX Servs., Inc.*, No. MJG-13-1942, 2014 WL 4388360, at *2 (D. Md. Sept. 4, 2014) (noting Maryland regulations defining professional and administrative capacity, which use language identical to the regulation defining executive capacity, meant "an employee who qualifies for the [] exemption under the FLSA will also qualify for that exemption under the MWHL"), *aff'd sub nom. Williams v. Genex Servs., LLC*, 809 F.3d 103 (4th Cir. 2015).

The FLSA exemptions are affirmative defenses, and the employer bears the burden of proof to establish "by clear and convincing evidence that an employee qualifies for exemption." *Shockley*, 997 F.2d at 21.[5]  "Additionally, the remedial nature of the statute requires that FLSA exemptions be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337–38 (4th Cir. 2008) (quoting *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir. 1997) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960))) (internal quotation marks omitted).  How an employee spends his time at work is a question of fact, but whether his "particular activities excluded him from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *see also Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004) ("The determination

---

[4] A modification effective January 1, 2020 revised the compensation requirement to not less than $684 per week.

[5] "To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of [the party's] factual contentions are highly probable." *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022) (quoting *United States v. Ali*, 874 F.3d 825, 831 n.2 (4th Cir. 2017) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984))) (internal quotation marks omitted).

of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question.").

ADH argues there is no genuine dispute of material fact that Pang meets all four requirements to be classified as an executive. Pang does not refute ADH's evidence or otherwise respond to ADH's argument that he was employed in an executive capacity. "Failure to address a defendant's arguments for summary judgment in an opposition brief is itself sufficient grounds to grant the defendant's motion." *Khatana v. Wash. Metro. Area Transit Auth.*, No. PWG-15-1664, 2017 WL 749233, at *5 (D. Md. Feb. 27, 2017) (quoting *Bost v. Brad*, No. SAG-12-2544, 2013 WL 5308275, at *7 (D. Md. Sep. 18, 2013) (citing *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997))). The Court nonetheless considers each requirement.

First, the employee must be compensated on a salary basis above a certain weekly floor. An employee is paid on a "salary basis" within the meaning of the regulation if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). It is undisputed that Pang's salary was set at $120,000 per year or a regular $2,500 per week, exceeding $455 per week.

Second, an employee's primary duty must be management. Management includes activities such as

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and

> sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  The term "primary duty" means the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  This determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*  Relevant factors include

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*  While the amount of time an employee spends performing exempt work "is not the sole test," an employee who spends more than 50 percent of his time on exempt work "will generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b); *Shockley*, 997 F.2d at 26 (discussing the 50 percent "rule of thumb").  Thus, an employee who performs work "such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills" more than 50 percent of the time may have a primary duty of management even if she also runs the cash register.  29 C.F.R. § 541.700(c).  But if the employee is closely supervised and earns little more than nonexempt employees, she may not meet the primary duty requirement.  *Id.*

The record is clear that Pang's primary duty as program director was management, both before and after he took on additional marketing responsibilities in October 2017.  Pang testified he managed operations at the center and considered himself to be a good manager.  His duties included supervising staff, overseeing purchases, submitting payroll information, attending conferences, and generally overseeing all aspects of the operation of the center.  He did not have

13

a set schedule, and he set his own priorities.  When asked to describe a normal day, he said his normal activities included checking in with various departments such as transportation and activities, checking whether supplies needed to be replenished, and making sure required documentation was completed on time.  There is no evidence from which a reasonable jury could conclude Pang spent less than half his time on these managerial duties.  Even after he took on additional marketing responsibilities, the number of hours Pang worked each week did not double, so it is not reasonable to infer he devoted significantly less time to his management responsibilities such that they took up less than 50 percent of his time.  Because there is no genuine dispute of material fact that Pang's primary duty was management, ADH has established the second requirement for classification as an executive.  *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 516 (4th Cir. 2011) (holding employee who was similarly in charge and "responsible for addressing any problem that could arise and did arise" during the facility's operations to have had a primary duty of management).

As to the third factor, Pang must have customarily and regularly directed the work of two or more other employees.  The phrase "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. § 541.701. Pang testified he delegated tasks, trained employees, and evaluated employee and departmental performance.  He pointed out things that were not done properly and proposed ways to improve, such as reminding drivers to be alert and how to take care of their vehicles properly.  While employees may have had more direct supervisors, Pang informed those supervisors of his evaluations.  He did not micromanage, but he met monthly with the health director, the transportation coordinator, and the activities coordinator to bring issues to their attention.  Taken together, these activities—whether characterized as supervision or oversight—constitute direction

of at least two other employees.  There is no genuine dispute of material fact that the third requirement is satisfied.  *See In re Family Dollar*, 637 F.3d at 513–14 (holding employee met the third requirement where she trained and managed employees and "engaged the employees in counseling and coaching to make sure that they performed their tasks as necessary").

Finally, either Pang must have had the authority to hire or fire other employees, or particular weight must have been given to his suggestions and recommendations as to the hiring, firing, advancement, promotion, or change of status of other employees.  To determine whether an employee's recommendations are given particular weight, courts consider "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  An employee's recommendations still may be deemed to have particular weight "even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision . . . ."  *Id.*

Pang did not himself hire, fire, or discipline other employees.  However, his job responsibilities included personnel management, and he testified he would interview job applicants and make hiring recommendations.  He also made change-of-status recommendations, though his testimony is ambiguous regarding whether they concerned discipline, advancement, or both.  Pang testified his change-of-status recommendations were implemented only 10 to 20 percent of the time, but this necessarily means that some of his recommendations were implemented.

This Court previously has held an employee met the fourth requirement for classification as an exempt executive where the employer offered evidence showing the employee's duties included interviewing and recommending job candidates, the employee "reported the problems

with and praise for employees" on forms used to evaluate other employees for raises and promotions, and management relied on the employee's recommendations on at least two occasions. *Buechler v. DavCo Rests., Inc.*, No. WDQ-09-227, 2009 WL 3833999, at *6–7 (D. Md. Nov. 16, 2009).  Though there was no evidence of the frequency with which the employee's opinion was requested or relied upon, the employee failed to refute the employer's evidence, and the Court granted summary judgment to the employer.  *Id.*  The facts in *Buechler* are of course not perfectly analogous to this record, but the Court finds the basic reasoning both portable and persuasive.  Even viewing the record in the light most favorable to Pang as the non-moving party, it is not genuinely disputed that Pang meets the fourth requirement of the executive capacity exemption.

The record evidence submitted by ADH and unrefuted by Pang establishes that Pang worked for ADH in an executive capacity and thus was exempt from state and federal overtime requirements.  No reasonable juror could find otherwise on the record before the Court.  ADH's motion for summary judgment on Counts I and II is granted.

## C.  MWPCL Claim

Pang claims he was not paid for his overtime hours in violation of the MWPCL, which provides a cause of action to employees if an employer fails to pay wages due.  Md. Code Ann., Lab. & Empl. § 3-507.2(a).  The Maryland Court of Appeals has interpreted the MWPCL to extend to "any unlawfully withheld overtime wages."  *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625–26 (Md. 2014).  Because Pang was not entitled to statutory overtime compensation during any period of his employment with ADH, there are no unpaid wages at issue, and Pang's claim under the MWPCL must fail.  The Court grants ADH's motion for summary judgment on Count III.

### D.  FMLA Claim

Pang claims his discharge was retaliation in violation of the FMLA.  "The FMLA provides proscriptive rights 'that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA.'"  *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009)).  The statute makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.  29 U.S.C. § 2615(a)(2).

Retaliatory intent "can be established by direct evidence of retaliation or through the familiar burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973)."  *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).  Under *McDonnell Douglas*, the plaintiff "must first make a prima facie showing that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity."  *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006).  As to causation, "[w]hile evidence as to the closeness in time 'far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.'"  *Id.* (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  Once the employer provides a non-retaliatory reason, the burden returns to the plaintiff to establish the stated reason is a pretext for retaliation.  *Id.*  To establish the necessary causal link at the final step, the plaintiff must prove but-for causation.  *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2595 (2021).

Pang has failed to establish a *prima facie* case of retaliation under the FMLA.  ADH has produced uncontested evidence that Pang did not request FMLA leave.  At his deposition, Pang stated that he recalled submitting only an Employee Time Off Request form, not an FMLA form.  Because Pang did not request FMLA leave, he did not engage in any activity protected by the FMLA, and his retaliation claim fails.

Additionally, even if Pang engaged in protected activity, the record is clear that he cannot establish causation.  It is undisputed that the decision to terminate Pang's employment preceded his request for leave.  Morris testified that he and Wright—Pang's two supervisors—decided to terminate Pang on August 3, 2018, the day before Pang requested time off.  Pang has not identified any evidence contradicting that testimony.  Because "an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a *prima facie* case."  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 675 (4th Cir. 1998)).  Logically, an employer cannot know about protected activity that has not yet occurred, precluding the necessary causal linkage.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (stating, in Title VII retaliation context, "[e]mployers need not suspend previously planned [employment actions] upon discovering" protected activity has occurred, "and their proceeding along lines previously contemplated . . . is no evidence whatever of causality"); *Santorocco v. Chesapeake Holding Co.*, No. AW-08-3049, 2010 WL 2464972, at *8 (D. Md. June 10, 2010) (granting summary judgment to employer on FMLA retaliation claim where the decision to eliminate the position predated the plaintiff's request for leave).

Pang does not genuinely dispute that he did not engage in protected activity or that the decision to terminate his employment preceded his request for leave. The Court grants summary judgment to ADH on Count IV.

### E.  Defamation Claim

Pang claims ADH defamed him when Xiao translated from English to Mandarin the announcement of his termination to a group of seniors. Pang argues the translation, and specifically the word used to communicate "fired," falsely implied he had committed wrongdoing detrimental to the company. To state a claim for defamation under Maryland law, a plaintiff must establish: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault for making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012) (quoting *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 448 (Md. 2009)). A defamatory statement is one "that tends to expose a person to public scorn, hatred, contempt, or ridicule, which, as a consequence, discourages others in the community from having a good opinion of, or associating with, that person." *Id.* (quoting *Indep. Newspapers, Inc.*, 966 A.2d at 448) (internal quotation marks omitted). A false statement is one "that is not substantially correct." *Id.* (quoting *Batson v. Shiflett*, 602 A.2d 1191, 1213 (Md. 1992)) (internal quotation marks omitted). When truth is asserted as a defense, the plaintiff bears the burden of establishing falsity. *Id.* (citing *Batson*, 602 A.2d at 1213); *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1174 (Md. 1995).

ADH argues the English translation of Xiao's statement—itself the Mandarin translation of Morris' statement—is neither false nor defamatory. Pang responds that the Mandarin word used to communicate "fired" has a strong negative connotation.

There is scant information in the record on this issue.  Morris testified in a declaration that he "asked a translator to make an announcement in Mandarin, that the Company decided to go in a different direction and that [Pang] was no longer employed by the Company."  ECF 61-3, ¶ 9. Morris "never instructed the translator to use the word for 'fired,' rather than 'terminated.'"  *Id.* Pang has not submitted any evidence contradicting Morris's recollection of what he asked the translator to announce.  Pang agreed during his deposition that Xiao translated Morris's statement as follows: "Mr. Pang is no longer an employee due to some issues at work; has been fired."  ECF 61-2, at 48 (147:3–7).  Pang then testified about the negative connotations of the Mandarin used by Xiao: "[B]ecause in the Chinese mentality, when you said 'fired,' that does already imply that I said some wrongdoings, that is something that's mental, not just an ordinary wrongdoing.  So that is the indication when you use the word 'fired.'"  *Id.* (147:8–13).  Neither ADH nor Pang have provided other evidence regarding Morris' original statement, the Mandarin used for its translation and its connotations, or what an accurate translation of Morris' statement would have been.

The burden is on Pang to prove the statement was false, and he has not identified evidence raising a genuine dispute of material fact on that issue.  To create a genuine issue for trial and survive summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  While Pang's deposition testimony suggests Xiao's choice of Mandarin words had a negative connotation, he has not identified any evidence in the record that the statement was false—in English or in Mandarin.

The Court grants summary judgment to ADH on Count V.

**IV.    Conclusion**

Pang has not provided grounds for reconsideration of the Court's Order denying his request

for a stay, and his motion for reconsideration is denied.  Additionally, ADH has established there

are no genuine disputes of material fact and that it is entitled to judgment as a matter of law on

each of Pang's claims.  ADH's motion for summary judgment is granted.  A separate order follows.


DATED this 21st day of July, 2022.


Deborah L. Boardman
United States District Judge